PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 94-9121
_____

D.C. Docket No. 94-CV-140-4MAC(WDO)


AURELIA DAVIS, as Next Friend of
LaShonda D.,


                                        Plaintiff-Appellant,

                        versus


MONROE COUNTY BOARD OF EDUCATION, et al.,


                                        Defendants-Appellees.

_____

Appeal from the United States District Court for the
Middle District of Georgia
_____


**(August 21, 1997)**


Before HATCHETT, Chief Judge, TJOFLAT, EDMONDSON, COX, BIRCH,
DUBINA, BLACK, CARNES and BARKETT, Circuit Judges,* and
KRAVITCH** and HENDERSON, Senior Circuit Judges.

_____
*Judge R. Lanier Anderson recused himself and did not participate
in this decision.
**Senior Judge Phyllis A. Kravitch, who was a member of the en
banc court which heard oral argument in this case, took senior
status on January 1, 1997, and has elected to participate in this
decision pursuant to 28 U.S.C. § 46(c).

TJOFLAT, Circuit Judge:

Appellant, Aurelia Davis, brought this suit against the Board of Education of Monroe County, Georgia, (the "Board") and two school officials, Charles Dumas and Bill Querry, on behalf of her daughter, LaShonda Davis. The complaint alleged that the defendants violated Section 901 of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235, 373 (1972) (codified as amended at 20 U.S.C. § 1681 (1994)) ("Title IX"), and 42 U.S.C. § 1983[1] by failing to prevent a student at Hubbard Elementary School ("Hubbard") from sexually harassing LaShonda while she was a student there. Appellant separately alleged that the defendants discriminated against LaShonda on the basis of race in violation of 42 U.S.C. § 1981.[2] Appellant sought injunctive

---

[1] This section provides, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (1994).

[2] Davis actually alleged that the named defendants discriminated on the basis of race in violation of "the Education Act of 1972 and the Civil Rights Act of 1991." Davis was apparently referring to the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (1972), and the Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (1991). The former act, however, does not address racial discrimination in education, and the latter act does not provide a cause of action for racial discrimination in education. The district court construed this portion of the complaint to allege a violation of 42 U.S.C. § 1981, which does provide a cause of action against certain types of racial discrimination.

relief and $500,000 in compensatory and punitive damages.

The district court dismissed appellant's complaint in its entirety for failure to state a claim upon which relief can be granted.  See <u>Aurelia D. v. Monroe County Bd. of Educ.</u>, 862 F. Supp. 363, 368 (M.D. Ga. 1994); <u>see also</u> **Fed. R. Civ. P.** 12(b)(6).  Appellant appealed the district court's dismissal of her Title IX claim against the Board,[3] arguing that a school board can be held liable under Title IX for its failure to

_____

[3] Davis did not appeal the district court's dismissal of her Title IX claim with regard to individual defendants Dumas and Querry.  Davis similarly did not appeal the district court's dismissal of her § 1981 claim.  Therefore, we do not consider these claims.

With regard to Davis' § 1983 claim, the complaint seemed to allege that the defendants were liable under this provision solely because they violated Title IX.  Davis, however, apparently argued before the district court that the defendants were liable under § 1983 for infringing LaShonda's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  The district court dismissed this implied claim under Rule 12(b)(6).  <u>See</u> <u>Aurelia D.</u>, 862 F. Supp. at 366.

Davis did not appeal the dismissal of her § 1983 claim to the extent it was based on the defendants' alleged violation of Title IX.  Accordingly, that claim is not before us.  She did, however, appeal the dismissal of her § 1983 claim to the extent it was based on the defendants' alleged violation of the Due Process Clause.  In addition, Davis argued for the first time before the three-judge panel that the same § 1983 claim encompassed a violation of the Equal Protection Clause of the Fourteenth Amendment.

The panel rejected Davis' due-process and equal-protection arguments and affirmed the dismissal of her steadily expanding § 1983 claim under **11th Cir. R.** 36-1.  <u>See</u> <u>Davis v. Monroe County Bd. of Educ.</u>, 74 F.3d 1186, 1188 (1996).  Davis did not petition the court to rehear this ruling en banc, and we see no reason to disturb the panel's decision <u>sua sponte</u>.  We therefore do not consider Davis' various § 1983 claims.  In sum, we address only Davis' Title IX claim against the Board.

prevent sexual harassment among students.  On appeal, a divided three-judge panel reinstated her Title IX claim against the Board.  See Davis v. Monroe County Bd. of Educ., 74 F.3d 1186, 1195 (11th Cir. 1996).  At the Board's request, we granted rehearing en banc to consider appellant's Title IX claim,[4] and we now affirm the district court's dismissal of this claim.

I.

A.

We review de novo the district court's dismissal of appellant's complaint for failure to state a claim upon which relief can be granted.  See McKusick v. City of Melbourne, 96 F.3d 478, 482 (11th Cir. 1996).  To this end, we take as true the allegations appellant has set forth in her complaint and examine whether those allegations describe an injury for which the law provides relief.  See Welch v. Laney, 57 F.3d 1004, 1008 (11th Cir. 1995).  We construe appellant's allegations liberally because the issue is not whether appellant will ultimately prevail but whether she is entitled to offer evidence to support her claims.  Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974).  We begin by describing the

---

[4]    See Davis v. Monroe County Bd. of Educ., 91 F.3d 1418 (11th Cir. 1996).  Granting rehearing en banc vacated the panel opinion by operation of law.  **11th Cir. R.** 35-11.

allegations contained in appellant's complaint.


                                   B.


     LaShonda Davis was enrolled as a fifth-grade student at
Hubbard during the 1992-1993 school year.  During that school
year, Bill Querry was the principal of Hubbard, and Diane Fort,
Joyce Pippin, and Whit Maples were teachers at the school.  The
complaint alleges that the Board administered federally funded
educational programs at Hubbard and supervised the school's
employees, including Principal Querry and Teachers Fort, Pippin,
and Maples.

     According to the complaint, a fifth-grade student named
"G.F." was in several of LaShonda's classes and initially was
assigned to the seat next to LaShonda in Fort's classroom.  On
December 17, 1992, while in Fort's classroom, G.F. allegedly
tried to touch LaShonda's breasts and vaginal area.  G.F. also
allegedly directed vulgarities at LaShonda, such as "I want to
get in bed with you" and "I want to feel your boobs."  LaShonda
complained to Fort.  After school that day, LaShonda also told
her mother, the appellant, about G.F.'s behavior.  The complaint
states that G.F. engaged in similar (although unspecified)

conduct on or about January 4, 1993,[5] and again on January 20, 1993.  LaShonda allegedly reported both incidents to Fort and to appellant.  After one of these first three incidents, appellant called Fort, who told appellant in the course of their conversation that Principal Querry knew about one of the incidents.

G.F.'s misconduct continued.  On February 3, 1993, G.F. allegedly placed a door-stop in his pants and behaved in a sexually suggestive manner toward LaShonda during their physical education class.  LaShonda reported this incident to Maples, who was the physical education teacher.  On February 10, 1993, G.F. engaged in unspecified conduct similar to that of the December 17 incident in the classroom of Pippin, another of LaShonda's teachers.  LaShonda notified Pippin of G.F.'s behavior and later told appellant, who then called Pippin to discuss the incident. On March 1, 1993, G.F. directed more unspecified, offensive conduct toward LaShonda during physical education class. LaShonda reported G.F. to Maples and Pippin.  An unidentified teacher allegedly told LaShonda that Principal Querry was not ready to listen to her complaint about G.F.

At some point around March 17, 1993, Fort allowed LaShonda

---

[5]     The complaint actually alleges that this second instance of harassment occurred "on or about January 2, 1993." We note that January 2, 1993 was a Saturday.  Presumably, there was no school on Saturday, so G.F. could not have sexually harassed LaShonda at Hubbard on that day.  Friday, January 1, 1993, was a holiday.  Accordingly, we assume for appellant's benefit that the alleged harassment occurred on or about January 4, 1993.

to change assigned seats away from G.F. G.F., however, persisted in his unwelcome attentions. On April 12, 1993, he rubbed his body against LaShonda in a manner she considered sexually suggestive; this incident occurred in the hallway on the way to lunch. LaShonda again complained to Fort.

Lastly, on May 19, 1993, LaShonda complained to appellant after school about more unspecified behavior by G.F. Appellant and LaShonda then paid a visit to Principal Querry to discuss G.F.'s conduct. At this meeting, Querry asked LaShonda why no other students had complained about G.F. During this meeting, Querry also told appellant, "I guess I'll have to threaten [G.F.] a little bit harder." On the same day, May 19, G.F. was charged with sexual battery, a charge which he apparently did not deny. The complaint does not tell us who summoned the police.

In all, the complaint describes eight separate instances of sexual harassment by G.F. These eight instances of alleged harassment occurred, on average, once every twenty-two days over a six-month period. Three instances occurred in Fort's classroom; two occurred in Maples' physical education class; one occurred in Pippin's classroom; one occurred in a school hallway; and one occurred in an unspecified location. LaShonda reported four instances of alleged harassment to Fort, two to Maples, and two to Pippin. LaShonda reported the final instance of harassment, the May 19 incident, to appellant and Querry. The complaint does not allege that any faculty member knew of more than four instances of harassment, and the complaint indicates

that Principal Querry learned of only one instance of harassment before his meeting with appellant and LaShonda on May 19.

The complaint does not state what action each of the teachers took upon being informed by LaShonda of G.F.'s demeaning conduct. We assume for appellant's benefit that the teachers took no action other than Fort's apparent notification of Principal Querry after one of the first three instances of alleged harassment and Fort's decision around March 17, 1993, to move LaShonda's assigned seat away from that of G.F. We will also accept as true that Principal Querry took no measures against G.F. other than threatening him with disciplinary action at some point before his May 19 meeting with appellant and her daughter. For example, we assume for appellant's benefit that someone other than the school staff instigated the prosecution of G.F.

Appellant claims that LaShonda suffered mental anguish because of G.F.'s behavior. As indicia of this emotional trauma, the complaint states that LaShonda's grades dropped during the 1992-1993 school year and that LaShonda wrote a suicide note in April 1993. Based on the above allegations, appellant contends that "[t]he deliberate indifference by Defendants to the unwelcomed [sic] sexual advances of a student upon LaShonda created an intimidating, hostile, offensive and abuse [sic] school environment in violation of Title IX." We therefore consider whether Title IX allows a claim against a school board based on a school official's failure to remedy a known hostile

8

environment[6] caused by the sexual harassment of one student by another ("student-student sexual harassment").

## II.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681 (1994).  Although nothing in the plain language of Title IX speaks to the issue of student-student sexual harassment, several district courts have held that Title IX allows a student to sue a school board for failing to prevent hostile-environment sexual harassment by another student.  See Doe v. Londonderry Sch. Dist., No. 95-469-JD, http://lw.bna.com/ #0708 (D. N.H. June 13, 1997); Nicole M. v. Martinez Unified Sch. Dist., No. C-93-4531 MHP, 1997 WL 193919, at *8 (N.D. Cal. Apr.

---

[6]     The term "hostile environment" sexual harassment originated in employment litigation under § 703 of the Civil Rights Act of 1964, Pub. L. No. 88-352, 78 Stat. 241, 255 (1964) (codified at 42 U.S.C. § 2000e-2 (1994)) ("Title VII").  Hostile-environment sexual harassment occurs whenever an employee's speech or conduct creates an atmosphere that is sufficiently severe or pervasive to alter another employee's working conditions.  See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 - 22, 114 S. Ct. 367, 370 - 71, 126 L. Ed. 2d 295 (1993).  As discussed infra, n.13, we conclude that Title VII standards of liability, borrowed from the employment context, do not control our resolution of this case.  Nevertheless, for purposes of our discussion of appellant's claim, we construe the complaint to allege that G.F.'s speech or conduct created an atmosphere that was sufficiently hostile or abusive to alter the conditions of LaShonda's learning environment.

15, 1997); <u>Collier v. William Penn Sch. Dist.</u>, 956 F. Supp. 1209, 1213 - 14 (E.D. Pa. 1997); <u>Bruneau By and Through Schofield v. South Kortright Cent. Sch. Dist.</u>, 935 F. Supp. 162, 172 (N.D. N.Y. 1996); <u>Doe v. Petaluma City Sch. Dist.</u>, 830 F. Supp. 1560, 1576 (N.D. Cal. 1993), <u>rev'd on other grounds</u>, 54 F.3d 1447 (9th Cir. 1995); <u>Burrow v. Postville Community Sch. Dist.</u>, 929 F. Supp. 1193, 1205 (N.D. Iowa 1996); <u>Wright v. Mason City Community Sch. Dist.</u>, 940 F. Supp. 1412, 1419 - 20 (N.D. Iowa 1996); <u>Bosley v. Kearney R-1 Sch. Dist.</u>, 904 F. Supp. 1006, 1023 (W.D. Mo. 1995); <u>Oona R.-S. v. Santa Rosa City Schs.</u>, 890 F. Supp. 1452, 1469 (N.D. Cal. 1995); <u>Patricia H. v. Berkeley Unified Sch. Dist.</u>, 830 F. Supp. 1288, 1293 (N.D. Cal. 1993). <u>But see</u> <u>Garza v. Galena Park Indep. Sch. Dist.</u>, 914 F. Supp. 1437, 1438 (S.D. Tex. 1994) ("[A] student cannot bring a hostile environment claim under Title IX.").

The courts of appeals, however, have been less enthusiastic. The Fifth Circuit has held that no cause of action exists where a school board merely knew or should have known of peer sexual harassment and failed to act. <u>See</u> <u>Rowinsky v. Bryan Indep. Sch. Dist.</u>, 80 F.3d 1006, 1016 (5th Cir.), <u>cert. denied</u>, --- U.S. ---, 117 S. Ct. 165, 136 L. Ed. 2d 108 (1996). Other circuits have resolved complaints of student-student sexual harassment without deciding whether a cause of action exists under Title IX for this alleged harm. <u>See, e.g.</u>, <u>Seamons v. Snow</u>, 84 F.3d 1226, 1232 - 33 (10th Cir. 1996) (holding that the plaintiff failed to state a valid claim for student-student sexual harassment because he

10

failed to allege that the harassment in question was on account of his sex); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 250 (2nd Cir. 1995) (holding that, even if Title IX created a private cause of action for sexual harassment by a non-employee of the school, plaintiff failed to allege that school officials knew or should have known of the harassment); Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1452 (9th Cir. 1994) (holding that a defendant school counselor was entitled to qualified immunity against a claim that he failed to respond to known sexual harassment of the plaintiff by other students).

The Supreme Court has not squarely addressed the issue of student-student sexual harassment. In general, the Court has allowed private plaintiffs to proceed under Title IX only in cases that allege intentional gender discrimination by the administrators of educational institutions. According to the Court, plaintiffs can state a claim under Title IX by alleging that a federally funded educational institution, acting through its employees, intentionally subjected them to discrimination in its educational programs or activities. See Cannon v. University of Chicago, 441 U.S. 677, 709, 99 S. Ct. 1946, 1964, 60 L. Ed. 2d 560 (1979). For example, where a teacher engaged a student in sexually oriented conversations, solicited dates from her, forcibly kissed her on the mouth, and thrice removed her from another class in order to engage in coercive sexual intercourse with her in a private office at the school, the Court found that the school board could be held liable for his actions. See

11

Franklin v. Gwinnett County Pub. Schs., 503 U.S. 60, 63 - 64, 76, 112 S. Ct. 1028, 1031, 1038, 117 L. Ed. 2d 208 (1992).

Neither the Supreme Court nor this court has ever found, however, that a school board can be held liable for failing to prevent non-employees from discriminating against students on the basis of sex. Appellant does not allege that any employee of the Board intentionally discriminated against LaShonda by personally participating in G.F.'s offensive conduct toward her. Rather, appellant alleges that the Board violated Title IX by failing adequately to respond to LaShonda's complaints. Neither the Supreme Court nor this court has considered whether a Title IX plaintiff can proceed under this theory. In short, by seeking direct liability of the Board for the wrongdoing of a student, appellant argues for an extension of liability under Title IX. We examine the legislative history of Title IX to determine whether Congress intended this provision to reach appellant's allegations.

A.

The provision now known as Title IX emerged from a flurry of bills regarding public education. In June and July 1970, the House Subcommittee on Education of the House Committee on Education and Labor, under the leadership of Representative Edith Green, held hearings on gender discrimination in federally funded educational programs. See Discrimination Against Women: Hearings

12

, 91st Cong., 2d Sess. (1970) [hereinafter House Hearings].  None of the testimony before Representative Green's subcommittee concerned student-student sexual harassment or related issues, such as school discipline.  Instead, the subcommittee's work focused on eliminating gender discrimination in school admissions and in the employment decisions of school administrators.

By 1970, section 703 of the Civil Rights Act of 1964 already prohibited gender discrimination in employment.  See Civil Rights Act of 1964, Pub. L. No. 88-352, § 703, 78 Stat. 241, 255 (1964) (codified at 42 U.S.C. § 2000e-2 (1994)) ("Title VII").[7]  Title VII, however, did not apply to educational institutions.  See § 702, 78 Stat. at 255 (codified as amended at 42 U.S.C. § 2000e-1 (1994)).  Similarly, section 601 of the Civil Rights Act prohibited racial discrimination by all recipients of federal funding.  See § 601, 78 Stat. at 252 (codified at 42 U.S.C. § 2000d (1994)) ("Title VI").[8]  Title VI did not ban gender discrimination by recipients of federal funding.

---

[7]     Title VII states, "It shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1) (1994).

[8]     Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d (1994).

To fill this gap in antidiscrimination legislation, the subcommittee drafted a proposed amendment to H.R. 16098, 91st Cong. (1970). This amendment would have applied to schools the non-discrimination requirements of Title VII and added "sex" to the types of discrimination banned by Title VI. See House Hearings, supra, at 1. In other words, the subcommittee's amendment was designed to bridge the gap between Title VII and Title VI. The amendment, however, never reached the House floor. See North Haven Bd. of Educ. v. Bell, 456 U.S. 512, 523 n.13, 102 S. Ct. 1912, 1919, n.13, 72 L. Ed. 2d 299 (1982).

On April 6, 1971, a new education bill was introduced in the House. See H.R. 7248, 92nd Cong. (1971). This bill contained a provision similar to the amendment proposed by Representative Green's subcommittee nearly one year earlier. Title X of H.R. 7248 prohibited gender discrimination in any education program or activity receiving federal financial support. **H.R. Rep. No.** 92-554, at 108 (1972), reprinted in 1972 U.S.C.C.A.N. 2462, 2511 - 12. The House report on H.R. 7248 described this provision as a response to discriminatory admissions policies and employment practices at federally funded schools. See id. Once again, neither the House report nor the underlying testimony discussed student-student sexual harassment.

While the House bill remained in committee, the Senate was considering a similar education bill. See S. 659, 92nd Cong. (1971). The Senate bill emerged from the Senate Committee on Labor and Public Welfare on August 3, 1971, without any

14

antidiscrimination provision at all.  Consequently, on August 5, 1971, Senator Birch Bayh introduced on the Senate floor an amendment to the committee's version of S. 659.  See 117 **Cong. Rec.** 30,156. (1971).  His amendment, like the House provision drafted by Representative Green's subcommittee, extended the antidiscrimination provisions of the Civil Rights Act of 1964 to gender discrimination by federally funded "institutions of higher learning."[9]  See id. at 30,155.  In defending his amendment, Senator Bayh did not discuss student-student sexual harassment, nor did he discuss school discipline.  He focused on gender discrimination in school admissions and employment opportunities for female teachers.  See id. at 30,155 - 56.  In any event, the Senate rejected Bayh's amendment as non-germane, id. at 30,415, and the Senate passed S. 659 on August 6, 1971, without an antidiscrimination provision.

On November 3, 1971, the House began consideration of S. 659, as passed by the Senate.  The House "amended" the Senate bill by striking virtually the entire contents of S. 659 and replacing it with the contents of H.R. 7248, including the antidiscrimination provision.  See **S. Rep. No.** 92-604, at 1 (1972), reprinted in 1972 U.S.C.C.A.N. 2595, 2595.  The House

---

[9]    Senator Bayh's first amendment provided, "No person . . . shall, on the ground of sex, . . . be subject to discrimination under any program or activity conducted by a public institution of higher education, or any school or department of graduate education, which is a recipient of Federal financial assistance for any education program or activity."  117 **Cong. Rec.** at 30,156.

15

made this change without official comment and passed its version of S. 659 on November 4, 1971.  See 117 **Cong. Rec.** at 30,882.

On November 24, 1971, the Senate, by unanimous consent, referred the House version of S. 659 back to the Committee on Labor and Public Welfare, which proceeded to amend the House version to conform to the original Senate version.  See **S. Rep. No.** 92-604, at 1 - 2 (1972), reprinted in 1972 U.S.C.C.A.N. 2595, 2595 - 96.  Once again, the committee did not discuss gender discrimination at all, much less sexual harassment among students.  On February 7, 1972, the Senate committee sent its own version of S. 659 back to the floor of the Senate.  See 118 **Cong. Rec.** 2806 (1972).

Once the bill returned to the Senate floor, Senator Bayh again introduced an amendment to add an antidiscrimination provision.[10]  See id. at 5802 - 03.  Bayh's proposal was intended to "close[] loopholes in existing legislation relating to general education programs and employment resulting from those programs." Id. at 5803.  In support of his amendment, Senator Bayh stated,

> we are dealing with three basically different types of
> discrimination here[:] . . . discrimination in
> admission to an institution, discrimination of [sic]
> available services or studies within an institution
> once students are admitted, and discrimination in

_____

[10]     Senator Bayh's second amendment stated, "No person . . . shall, on the basis of sex, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  118 **Cong. Rec.** at 5803.

16

employment within an institution, as a member of the
faculty or whatever.

Id. at 5812.  To counter these problems, Senator Bayh proposed a
provision he thought would "cover such crucial aspects as
admissions procedures, scholarships, and faculty employment, with
limited exceptions."  Id. at 5803.  Yet again, no senator
mentioned student-student sexual harassment or school discipline.

The Senate adopted Bayh's second amendment on February 28,
1972.  See 118 **Cong. Rec.** at 5815 (1972).  Because of
irreconcilable differences between the House and Senate versions
of S. 659, both Houses referred the bill to a conference
committee.  See **S. Conf. Rept.** No. 92-798, at 1 (1972).  The
conference committee reported out a joint bill containing the
antidiscrimination measure now known as Title IX.  The committee,
however, did not explain its reasons for including Title IX.  The
conference bill passed both Houses and was signed into law on
June 23, 1972.  See 118 **Cong. Rec.** at 22,702.  Throughout this
long legislative history, the drafters of Title IX never
discussed student-student sexual harassment or the related issue
of school discipline.

B.

While the legislative history of Title IX does not indicate
that Congress authorized a private cause of action for student-
student sexual harassment, the legislative history does show that

17

Title IX was enacted under the Spending Clause of Article I. See **U.S. Const.** art. I, § 8, cl. 1.[11] When Congress conditions the receipt of federal funding upon a recipient's compliance with federal statutory directives, Congress is acting pursuant to its spending power. See Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 598 - 99, 103 S. Ct. 3221, 3230 - 31, 77 L. Ed. 2d 866 (1983) (opinion of White, J.). The legislative history of Title IX indicates that Congress intended to impose upon recipients of federal educational assistance a requirement of non-discrimination on the basis of sex. The Spending Clause authorized Congress to impose this condition.

Representative Green put it succinctly: "If we are writing the law, I would say that any institution could be all men or all women, but my own feeling is that they do it with their own funds and not taxpayers' funds." Higher Education Amendments of 1971: Hearings on H.R. 32, H.R. 5191, H.R. 5192, H.R. 5193, and H.R. 7248 Before the Special Subcomm. on Education of the House Comm. on Education and Labor, 92nd Cong., 1st Sess. 581 (1971). Representative Green also quoted with approval President Nixon, who had stated, "Neither the President nor the Congress nor the conscience of the Nation can permit money which comes from all the people to be used in a way which discriminates against some of the people." 117 **Cong. Rec.** at 39,257 (1971) (statement of

---

[11]    Section 8 of Article I provides, in part, that "[t]he Congress shall have [the] Power To . . . provide for the . . . general Welfare of the United States." **U.S. Const.** art. I, § 8, cl. 1.

18

Rep. Green). To Senator Bayh, the reach of Title IX was clearly restricted to federally funded institutions. See 118 **Cong. Rec.** at 5812. In support of Title IX, Senator McGovern stated, "I urge my colleagues to take every opportunity to prohibit Federal funding of sex discrimination." 117 **Cong. Rec.** at 30,158. This legislative history clearly shows that Congress intended Title IX to be a "typical 'contractual' spending-power provision."[12] Guardians Ass'n, 463 U.S. at 599, 103 S. Ct. at 3231.

In addition to these indications of congressional intent, similarities between Title IX and Title VI indicate that Title IX was enacted pursuant to the Spending Clause. As noted above, Title VI prohibits recipients of federal funding from engaging in race discrimination. In Guardians Association v. Civil Service

---

[12] The Supreme Court has left open the question of whether Title IX was enacted under the Spending Clause. See Franklin, 503 U.S. at 75 n.8, 112 S. Ct. at 1038 n.8. One could argue, as did the petitioner in Franklin, that Title IX was enacted under § 5 of the Fourteenth Amendment, which provides Congress with the authority to enact legislation preventing states from "deny[ing] to any person . . . the equal protection of the laws." **U.S. Const.** amend. XIV, § 1, cl. 4.

The Equal Protection Clause, however, only protects against action by state-sponsored entities. See Shelley v. Kraemer, 334 U.S. 1, 13, 68 S. Ct. 836, 842, 92 L. Ed. 1161 (1948). Federal funding does not make a public school a state actor. See Blackburn v. Fisk University, 443 F.2d 121, 123 (6th Cir. 1971). Thus, if Title IX had been enacted under the Fourteenth Amendment, then the antidiscrimination provision of Title IX would not reach federally funded schools that were not state actors. We think that the plain language of Title IX commands a different result: no school that receives federal funding may discriminate on the basis of gender. Therefore, we conclude that Title IX was enacted pursuant to a power that can reach non-state actors as well as state actors -- the spending power. See Rowinsky, 80 F.3d at 1013 n.14.

19

Commission, at least six members of the Supreme Court agreed that Title VI was enacted under the Spending Clause.  See 463 U.S. at 598 - 99, 629, 638, 103 S. Ct. at 3230 - 31, 3247, 3251; see also Lau v. Nichols, 414 U.S. 563, 568 - 69, 94 S. Ct. 786, 789, 39 L. Ed. 2d 1 (1974) (describing how a school district "contractually agreed to comply with title VI" when it accepted federal funding).

As Justice White quoted from the legislative history of Title VI, "It is not a regulatory measure, but an exercise of the unquestioned power of the Federal Government to fix the terms on which Federal funds shall be disbursed."  Guardians Ass'n, 463 U.S. at 599, 103 S. Ct. at 3231 (quoting 110 **Cong. Rec.** 6546 (1964) (quoting Oklahoma v. Civil Serv. Comm'n, 330 U.S. 127, 143, 67 S. Ct. 544, 553, 91 L. Ed. 794 (1947))) (internal quotation marks omitted).  Justice White summed up the legislative philosophy behind Title VI:  "Stop the discrimination, get the money; continue the discrimination, do not get the money."  Guardians Ass'n, 463 U.S. at 599, 103 S. Ct. at 3231 (quoting 110 **Cong. Rec.** at 1542) (internal quotation marks omitted).  This interpretation matches the plain language of Title VI, which conditions the disbursement of federal funds on the recipient's agreement not to discriminate on the basis of race.  See 42 U.S.C. § 2000d (1994).

The language of Title IX is virtually identical to the language of Title VI.  See 117 **Cong. Rec.** at 30,156 (statement of Sen. Bayh).  The only differences are the substitution of the

20

words "on the basis of sex" for the words "on the ground of race, color, or national origin" and the insertion of the word "educational" in front of the words "program or activity."  See Grove City College v. Bell, 465 U.S. 555, 586, 104 S. Ct. 1211, 1228, 79 L. Ed. 2d 516 (1984) (Brennan, J., concurring in part and dissenting in part); compare 42 U.S.C. § 2000d with 20 U.S.C. § 1681(a).  Not surprisingly, the Supreme Court has found that "Title IX was patterned after Title VI."  Cannon, 441 U.S. at 694, 99 S. Ct. at 1956.

The Supreme Court's study of the legislative history of Title IX has led it to conclude that the drafters of Title IX intended that courts interpret it in the same way they have interpreted Title VI.  Id. at 696, 99 S. Ct. at 1957.  Therefore, we find that Title IX, like Title VI, was enacted under Congress' power to spend for the general welfare of the United States.  See Rosa H. v. San Elizario Indep. Sch. Dist., 106 F.3d 648, 654 (5th Cir. 1997); Lieberman v. University of Chicago, 660 F.2d 1185, 1187 (7th Cir. 1981), cert. denied, 456 U.S. 937, 102 S. Ct. 1993, 72 L. Ed. 2d 456 (1982).  We now consider the implications of this finding.

III.

A.

When Congress enacts legislation pursuant to the Spending

21

Clause, it in effect offers to form a contract with potential recipients of federal funding. See Pennhurst v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 1540, 67 L. Ed. 2d 694 (1981). Recipients who accept federal monies also accept the conditions Congress has attached to its offer. See South Dakota v. Dole, 483 U.S. 203, 206, 107 S. Ct. 2793, 2795 - 96, 97 L. Ed. 2d 171 (1987). A prospective recipient is free to decline a grant of federal funding. See New York v. United States, 505 U.S. 144, 168, 112 S. Ct. 2408, 2424, 120 L. Ed. 2d 120 (1992). Similarly, a current recipient may withdraw from a federal program and decline further funding if it so chooses. See Guardians Ass'n, 463 U.S. at 596, 103 S. Ct. at 3229. The freedom of recipients to decline prospectively or to terminate retrospectively a grant of federal funding ensures that they will remain responsive to the preferences of their local constituents. See New York, 505 U.S. at 168, 112 S. Ct. at 2424.

To ensure the voluntariness of participation in federal programs, the Supreme Court has required Congress to give potential recipients unambiguous notice of the conditions they are assuming when they accept federal funding. Pennhurst, 451 U.S. at 17, 101 S. Ct. at 1540. A spending power provision must read like a prospectus and give funding recipients a clear signal of what they are buying. The Court has explained, "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Id. With regard to the case at hand,

22

"Congress must be unambiguous in expressing to school districts the conditions it has attached to the receipt of federal funds." Canutillo Indep. Sch. Dist. v. Leija, 101 F.3d 393, 398 (5th Cir. 1996), cert. denied, --- U.S. ---, --- S. Ct. ---, --- L. Ed. 2d --- (1997). We therefore consider whether Congress gave the Board unambiguous notice that it could be held liable for failing to stop G.F.'s harassment of LaShonda.

Appellant and the United States Department of Justice, as amicus curiae, argue that Title IX gave the Board clear notice of this form of liability. Appellant points to the Supreme Court's decision in Franklin. In Franklin, the Court suggested that "th[e] notice problem does not arise in a case . . . in which intentional discrimination is alleged." 503 U.S. at 74 - 75, 112 S. Ct. at 1037. The Court stated that the plain language of Title IX imposes on schools a duty not to discriminate on the basis of sex, and when a school teacher sexually harasses a student, that teacher is discriminating on the basis of sex. Id. at 75, 112 S. Ct. at 1037. Appellant argues that a school employee is intentionally discriminating on the basis of sex when he or she fails to prevent one student from sexually harassing another.[13] Hence, appellant asserts that the school board here

---

[13] Appellant and the Department of Justice argue that we should use Title VII standards of liability to interpret Title IX. An employer is directly liable under Title VII if it is deliberately indifferent to peer sexual harassment in the workplace. See Faragher v. City of Boca Raton, 111 F.3d 1530, 1538 - 39 (11th Cir. 1997) (en banc). Appellant argues that a school should also be liable if it is deliberately indifferent to peer sexual harassment at school.

The superficial appeal of this argument has attracted the adherence of a few courts. See, e.g., Bruneau, 935 F. Supp. at 170 - 71. These courts have applied Title VII standards of liability to Title IX cases simply because (1) Title VII and Title IX both deal with sexual harassment and (2) the Supreme Court once cited a Title VII case in discussing liability under Title IX, see generally Franklin, 503 U.S. at 75, 112 S. Ct. at 1037 (quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 64, 106 S. Ct. 2399, 2404, 91 L. Ed. 2d 49 (1986)). See Bruneau, 935 F. Supp. at 170 - 71.

However, the Supreme Court has never discussed student-student sexual harassment or generally applied Title VII jurisprudence to Title IX cases. Perhaps for this reason, some courts that have imposed Title VII-type liability under Title IX have refused -- without much explanation -- to apply all of Title VII jurisprudence to Title IX. See, e.g., Bruneau, 935 F. Supp. at 169 - 70 ("[T]he Court cautions that by holding that Title VII legal standards apply to an analysis of Title IX claims, the Court is not holding that the entirety of Title VII jurisprudence must be applied to Title IX."). Other courts have altogether refused to apply Title VII jurisprudence to Title IX. See, e.g., Rosa H., 106 F.3d at 656 ("Franklin's single citation to Meritor Savings to support the Court's conclusion that sexual harassment is sex discrimination does not by itself justify the importation of other aspects of Title VII law into the Title IX context.").

We decline appellant's invitation to use Title VII standards of liability to resolve this Title IX case. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1450 - 51 (9th Cir. 1994). First, Title VII and Title IX are worded differently. If Congress wished Title IX to be interpreted like the earlier-enacted Title VII, Congress would have written Title IX to read like Title VII. Congress did not. Interpreting the plain language of different statutes does not automatically produce the same result simply because both statutes proscribe similar behavior.

Second, Title VII was enacted under the far-reaching Commerce Clause and § 5 of the Fourteenth Amendment. See E.E.O.C. v. Pacific Press Publ'g Ass'n, 676 F.2d 1272, 1279 n.10 (9th Cir. 1982). Title IX was not, and consequently its reach is narrower.

Third, the exposition of liability under Title VII depends upon agency principles. See Meritor, 477 U.S. at 72, 106 S. Ct. at 2408; Faragher, 111 F.3d at 1534 - 36. Agency principles are useless in discussing liability for student-student harassment under Title IX, because students are not agents of the school board. See generally **Restatement (Second) of Agency** § 1 (1958)

24

had sufficient notice, for purposes of the Spending Clause, that

it could be held liable.  We disagree.[14]

---

(defining an agency relationship as one in which the principal consents to representation by the agent and the agent consents to control by the principal).  Therefore, even if employers owe to employees some sort of nondelegable duty to eliminate peer harassment in the workplace, see generally id. § 492 (discussing employers' duty to provide reasonably safe working conditions for their employees), schools owe to students no comparable duty.  In short, Title VII jurisprudence does not control the outcome of this case.

[14]     We note that neither this court nor the Supreme Court in Franklin fully addressed the question of whether a student can state a claim under Title IX for sexual harassment by a teacher -- much less whether a student can state a claim under Title IX for sexual harassment by another student.

The defendant school board in Franklin successfully moved the district court to dismiss Franklin's Title IX suit on the ground that "compensatory relief is unavailable for violations of Title IX," a holding which this court affirmed.  Franklin v. Gwinnett County Pub. Schs., 911 F.2d 617, 618 (11th Cir. 1990). The school board apparently conceded on appeal that the plaintiff's allegations stated a claim under Title IX.  See id. at 619.

Similarly, the school board conceded before the Supreme Court that teacher-student sexual harassment violated Title IX. See Brief for Respondents at 2, 7, Franklin v. Gwinnett County Sch. Dist., 503 U.S. 60, 112 S. Ct. 1028, 117 L. Ed. 2d 208 (1992) (No. 90-918).  The Supreme Court granted certiorari to consider "whether the implied right of action under Title IX . . . supports a claim for monetary damages."  Franklin, 503 U.S. at 62 - 63, 112 S. Ct. at 1031.  The Court emphasized that "the question of what remedies are available under a statute that provides a private right of action is 'analytically distinct' from the issue of whether such a right exists in the first place."  Id. at 65 - 66, 112 S. Ct. at 1032.  In fact, the Franklin Court rejected the arguments of the United States as amicus curiae precisely because those arguments concerned the existence vel non of a cause of action for teacher-student sexual harassment, a question which the Court considered "irrelevant." Id. at 69, 112 S. Ct. at 1034.

The Franklin Court discussed the notice element of the Spending Clause solely to counter the school board's argument that "the normal presumption in favor of all appropriate remedies should not apply because Title IX was enacted pursuant to

The terms of Title IX gave educational institutions notice that they must prevent their employees from themselves engaging in intentional gender discrimination. See <u>Franklin</u>, 503 U.S. at 75, 112 S. Ct. at 1037. Thus, school administrators cannot deny admission to female applicants because of their gender. See <u>Cannon</u>, 441 U.S. at 709, 99 S. Ct. at 1964. School administrators cannot discriminate against teachers on account of sex. See <u>North Haven Bd. of Educ.</u>, 456 U.S. at 530, 102 S. Ct. at 1922 - 23. Teachers cannot sexually harass their students. See <u>Franklin</u>, 503 U.S. at 74 - 75, 112 S. Ct. at 1037.

The present complaint, however, does not allege that a school employee discriminated against LaShonda in any of the foregoing ways. The complaint does not allege, for example, that Fort, Maples, Pippin, or Querry sexually harassed LaShonda. Rather, the complaint alleges that these individuals failed to take measures sufficient to prevent a <u>non-employee</u> from discriminating against LaShonda. We do not think that the Board was on notice when it accepted federal funding that it could be held liable in this situation.

B.

---

Congress' Spending Clause power." <u>Id.</u> at 74, 112 S. Ct. at 1037. Viewed in this light, the Supreme Court's suggestion that teacher-student sexual harassment gives rise to a cause of action under Title IX was arguably dicta. We assume that <u>Franklin</u> created a cause of action for teacher-student sexual harassment under Title IX, but we are wary of extending this assumed holding to student-student sexual harassment. In any event, the Court's discussion of this issue does not foreclose our own consideration of whether appellant has stated a claim under Title IX.

26

First, as we have noted, nothing in the language or history of Title IX suggests that Title IX imposes liability for student-student sexual harassment.[15]  Second, the imposition of this form of liability would so materially affect schools' decisions whether to accept Title IX funding that it would require an express, unequivocal disclosure by Congress.  Adopting appellant's theory of liability, however, could give rise to a form of "whipsaw" liability, under which public schools would face lawsuits from both the alleged harasser and the alleged victim of the harassment.  Moreover, reasonable public school officials could perceive the likely number of such suits to be large.  Because our endorsement of appellant's theory of liability would alter materially the terms of the contract between Congress and recipients of federal funding, appellant fails to state a claim upon which relief can be granted.

The essence of appellant's complaint is this:  once a public school student complains to her teacher that a classmate has sexually harassed her, the teacher and the school board become

---

[15]    The dissent devotes a great deal of attention to whether Congress intended that Title IX create a cause of action for student-student sexual harassment.  See Post, at *1 - *7.  We seriously doubt whether Congress considered this problem at all when it enacted Title IX, but, in any case, the dissent's heavy reliance on its conclusory analysis of the language and history of Title IX is largely irrelevant.  The question is not whether Congress intended to create a cause of action under Title IX for student-student sexual harassment but, rather, whether Congress gave school boards notice of this form of liability.  In the absence of any supporting legislative history, statutory construction of ambiguous language cannot support a finding of notice as required by the Spending Clause.

subject to the threat of liability in money damages under federal law if they can prevent the classmate from harassing again and fail to do so.[16]  See, e.g., Bosley, 904 F. Supp. at 1023 ("Once a school district becomes aware of sexual harassment, it must promptly take remedial action which is reasonably calculated to end the harassment.") (emphasis added).  In practical terms, this means that school officials would have to isolate an alleged harasser from other students through suspension or expulsion.

The complaint devotes little attention to what measures the Board could have taken to avoid liability.  The complaint admits that Querry and Fort tried to stop G.F.'s harassment by threatening him and by separating him from LaShonda within Fort's classroom.  Appellant clearly does not believe that these measures sufficed.  As evidence of "deliberate indifference," the complaint also alleges that the Board failed to create a school sexual harassment policy.  It seems unlikely, however, that the mere existence of such a policy would foreclose liability under appellant's theory of the case.

Apparently, the appropriateness of the Board's remedial measures depends on whether the harassment actually ends.  The complaint suggests that G.F. should have been "suspended, kept

---

[16]  Private schools that receive federal funding would also be subject to suit under appellant's theory of Title IX liability.  Private school teachers and administrators, however, would not ordinarily be subject to suit under § 1983, as would their public school counterparts, because they would not ordinarily be acting under color of state law.  See § 1983; see generally supra, n.2.  Accordingly, we discuss individual liability only with respect to public school employees.

away from LaShonda, or disciplined in [some] way" after LaShonda complained. The Department of Justice argues broadly that a school board must take "effective action" in response to an allegation of harassment. We take these arguments to mean the same thing: a school board must immediately isolate an alleged harasser from other students to avoid the threat of a lawsuit under Title IX.

Physical separation of the alleged harasser from other students is the only way school boards can ensure that they cannot be held liable for future acts of harassment. If a school official simply tells the alleged harasser, "Don't do it again," and the harasser does it again, then the board becomes susceptible to the argument that it had the power to end the harassment, but failed to do so out of "deliberate indifference." If the official merely transfers the alleged harasser to another classroom, the board faces the threat of suit for any acts of harassment committed by him in the new classroom -- after all, the school had notice of his dangerous propensities and did not do all it could to prevent him from harassing his new classmates. Segregating the sexes into two separate programs within the same school would violate the spirit, if not the letter, of Title IX. Therefore, in practical terms, to avoid the threat of Title IX liability under appellant's theory of the case, a school must immediately suspend or expel a student accused of sexual

harassment.[17]

Appellant's standard of liability therefore creates for school boards and school officials a Hobson's choice: On the one hand, if a student complains to a school official about sexual harassment, the official must suspend or expel the alleged harasser or the board will face potential liability to the victim. Moreover, if a public school official with control over the harasser finds out about his misconduct and fails to isolate him, that official runs the risk of personal liability under 42 U.S.C. § 1983 for depriving the victim of her Title IX rights if the harasser engages in further abuse.[18] See Nicole M., 1997 WL 193919, at *13; Oona R.-S., 890 F. Supp. at 1462; see also Lillard v. Shelby County Bd. of Educ., 76 F.3d 716, 723 – 24 (6th Cir. 1996) (holding that the remedial scheme of Title IX does not preclude a section 1983 claim based on the same conduct).

On the other hand, if the public school official, presiding

---

[17] This is the approach, incidentally, that some school boards have already adopted. See, e.g., Tamar Lewin, Kissing Cases Highlight Schools' Fears of Liability for Sexual Harassment, **N.Y. Times**, Oct. 6, 1996, at A22, A22 ("While the recent suspensions of two little boys for kissing girls were widely seen as excessive, they highlight the confusion that is sweeping schools as educators grapple with a growing fear that they may be sued for failing to intervene when one student sexually harasses another.").

[18] If we were to rule in favor of appellant, Fort, Maples, Pippin, Querry, and Dumas would arguably be entitled to qualified immunity against § 1983 liability for their actions in this case. See Doe v. Petaluma City Sch. Dist., 54 F.3d 1447, 1452 (9th Cir. 1995). Ruling in favor of appellant, however, would deprive future, similarly situated defendants of qualified immunity, because it would clearly establish a statutory right of which a reasonable school employee would know.

30

over a disciplinary hearing, suspends or expels the alleged

harasser, the school board may face a lawsuit alleging that the

official acted out of bias -- out of fear of suit.  The right to

a public education under state law is a property interest

protected by the Due Process Clause of the Fourteenth Amendment.

See Goss v. Lopez, 419 U.S. 565, 574, 95 S. Ct. 729, 736, 42 L.

Ed. 2d 725 (1975).  Accordingly, students facing a deprivation of

this right must be afforded due process.[19]  Id. at 579, 95 S. Ct.

at 738.  A fair hearing in a fair tribunal is a basic requirement

of due process.  In re Murchison, 349 U.S. 133, 136, 75 S. Ct.

623, 625, 99 L. Ed. 942 (1955).  The decisionmaker who presides

over the hearing must be impartial.[20]  See Withrow v. Larkin, 421

---

[19]    If Georgia provided a procedure for challenging the
impartiality of the school's decisionmaker, the alleged harasser
would have received all the process to which he was entitled, and
he would have no claim under the Due Process Clause.  See
McKinney v. Pate, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc).
Absent such a procedure, he could bring suit in federal court
under § 1983, alleging that the state failed to accord him the
process he was due.  Whether the alleged harasser repairs to
state court or to federal court, however, the disruptive effect
on school officials, teachers, and students would be the same.

[20]    In his separate opinion, JUDGE CARNES insists that the
requirements of the procedural component of the Due Process
Clause are met when a school disciplinarian affords a student
faced with suspension an "informal" opportunity to explain his
side of the story.  See Post, at *1 - *2.  JUDGE CARNES'
reasoning is correct, as far as it goes, but he focuses on one
narrow subset of cases -- "any suspension of up to ten days."
Post at *1.

     In Goss, the Supreme Court held that, "[a]t the very
minimum, . . . students facing suspension and the consequent
interference with a protected property interest must be given
some kind of notice and afforded some kind of hearing."  Id. at
579, 95 S. Ct. at 738.  The kind of notice and the formality of
the hearing will depend, of course, on the nature and severity of
the deprivation the student faces:  for example, "due process

31

U.S. 35, 46, 95 S. Ct. 1456, 1464, 43 L. Ed. 2d 712 (1975);

McKinney v. Pate, 20 F.3d 1550, 1561 (11th Cir. 1994) (en banc).

As we explain above, appellant's theory of the case could impose personal liability on any public school official who learns of an allegation of harassment and fails to exercise his authority to prevent a recurrence of the harassment. Were we to adopt appellant's theory of the case, therefore, public school

---

requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." Id. at 581, 95 S. Ct. at 740 (emphasis added); see also, e.g., Board of Curators v. Horowitz, 435 U.S. 78, 86, 98 S. Ct. 948, 953, 55 L. Ed. 2d 124 (1978) (noting that a college student's dismissal for academic reasons necessitates fewer procedural protections than a dismissal for disciplinary reasons).

At the end of its opinion in Goss, however, the Supreme Court stated, "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures. Nor do we put aside the possibility that in unusual situations, although involving only a short suspension, something more than rudimentary procedures will be required." Id. at 584, 95 S. Ct. at 741. The Supreme Court left open the possibility that a more formal notice and hearing would be required for disciplinary actions more serious than ten-day suspensions, and so shall we.

Furthermore, regardless of the nature of the notice and the quality of the hearing, an individual faced with the deprivation of a property interest is entitled to an impartial decisionmaker -- a requirement JUDGE CARNES seems to discount. See, e.g., Nash v. Auburn Univ., 812 F.2d 655, 665 (11th Cir. 1987) ("An impartial decision-maker is an essential guarantee of due process."). JUDGE CARNES admits, for example, that a public school principal would be impermissibly biased, for purposes of the Due Process Clause, if the principal "took a bribe from [a] complaining student's parents in return for suspending or expelling [an] alleged wrongdoer." Post, at *2. JUDGE CARNES, however, refuses to accept that a principal would be just as impermissibly biased if the principal were forced to pay money to a complaining student for not suspending or expelling an alleged wrongdoer. We fail to grasp the distinction.

32

officials would have a financial incentive to punish alleged

student harassers.  A financial incentive may render a

decisionmaker impermissibly biased.[21]  See Gibson v. Berryhill,

---

[21]  On page *4 of his separate opinion, JUDGE CARNES leads us through a parade of horribles which, he imagines, we have created by suggesting that appellant's theory of the case would potentially give public school officials an impermissible financial incentive to punish alleged student harassers.  The dire consequences he conjures, however, will never come to pass precisely because we are not adopting appellant's theory of Title IX liability.  Only if we were to adopt her theory might public school officials face potential liability under both Title IX and the procedural component of the Due Process Clause.  But we do not adopt appellant's theory of liability.

With regard to non-school settings, JUDGE CARNES overstates our opinion and then criticizes us for the breadth of our holding.  He chides us for suggesting that "[a]ll federal, state, or local officials called upon to decide what to do in response to one person's complaint about another would have a financial incentive to avoid a lawsuit, which would disqualify them from making a decision."  Post, at *4.  We suggest nothing of the kind.

Nevertheless, on the merits of his critique, we suppose that all officials in such situations could face lawsuits alleging impermissible bias -- if none of those officials had any form of immunity from suit, which, of course, they do have.  Stated differently, public decisionmakers have immunity from suit to protect them from the sort of bias which might otherwise give rise to violations of the Due Process Clause.  Judges, for example, have absolute immunity from suit because "the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability."  Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435, 113 S. Ct. 2167, 2171, 124 L. Ed. 2d 391 (1993).  Similar concerns motivate qualified immunity.  See generally Harlow v. Fitzgerald, 457 U.S. 800, 814, 102 S. Ct. 2727, 2736, 73 L. Ed. 2d 396 (1982) (reasoning that, without qualified immunity, "there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties'" (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2nd Cir. 1949), cert. denied, 339 U.S. 949, 70 S. Ct. 803, 94 L. Ed. 1363 (1950)) (alterations in original)).  In fact, as we discuss supra, note 18, the individual defendants in this case would likely be entitled to qualified immunity.

33

411 U.S. 564, 579, 93 S. Ct. 1689, 1698, 36 L. Ed. 2d 488 (1973).

Therefore, the disciplinary measures required to avoid liability under Title IX could subject the school board to the threat of suit by the disciplined harasser.[22]

In addition to the threat of this whipsaw liability, schools would face the virtual certainty of extensive litigation costs. These costs would include not only lawyers fees, but also the burdens associated with the disruption of the educational process. The litigation we describe would inevitably involve

---

In sum, we create no new procedural due process rights, as JUDGE CARNES asserts. Our opinion does not even suggest that we would have to create such rights if we were to uphold appellant's theory of Title IX liability. Rather, our opinion states that this form of liability is a logical extension of appellant's theory of the case, and Congress gave no notice to public school boards that they would be potentially undertaking this form of liability when they accepted federal funding under Title IX.

[22] All of the foregoing assumes, of course, that the allegations of harassment are true. While we hesitate to assume that any allegations of student-student sexual harassment are false, we do not doubt that school students will be tempted into mischief by the prospect of swift punishment against any classmate whom they accuse of sexual harassment.

Moreover, public school officials would find such false accusations difficult to combat. Under Title VII standards of liability, which the appellant, the United States, and the dissent seem anxious to adopt, an employer may be sued for retaliating against an employee who complains about sexual harassment. See generally 42 U.S.C. § 2000e-3(a) (1994) ("It shall be an unlawful employment practice for an employer . . . to discriminate against any individual . . . because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."). Thus, under the logical implications of appellants theory of Title IX liability, a school board could face a lawsuit from the complaining student if it disciplines her for bringing a vexatious complaint against a classmate. As discussed in the text, the threat of lawsuits under § 1983 against the public school officials themselves would soon follow.

34

teachers, students, and administrators in time-consuming discovery and trial preparation.  Schools could reasonably expect to receive from Congress explicit notice of these consequences.  They did not.[23]

---

[23]     Appellant and the Department of Justice draw our attention to the regulatory activities of the Office of Civil Rights of the United States Department of Justice ("OCR").  The OCR issued interim guidelines concerning schoolhouse sexual harassment on August 16, 1996.  <u>See</u> Sexual Harassment Guidance: Peer Sexual Harassment, 61 Fed. Reg. 42,728 (1996).  These guidelines issued after the alleged harassment of LaShonda.  Moreover, at the time of the alleged harassment, the code of federal regulations did not discuss student-student sexual harassment.  <u>See</u> 34 C.F.R. § 106.31 (1992).  Therefore, OCR's regulations did not put the Board on official notice of its potential liability for G.F.'s harassment of LaShonda.

Nevertheless, appellant and the Department of Justice urge that we defer to the OCR's current interpretation of Title IX for purposes of this case.  The OCR issued final policy guidance on student sexual harassment on March 13, 1997.  <u>See</u> Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034 (1997).  In this publication, the OCR constructs a labyrinth of factors and caveats which simply reinforces our conclusion that the Board was not on notice that it could be held liable in the present situation.

According to the March 13 guidance, schools are liable for failing to eliminate

> sexually harassing conduct (which can include unwelcome
> sexual advances, requests for sexual favors, and other
> verbal, nonverbal, or physical conduct of a sexual
> nature) . . . by another student . . . that is
> sufficiently severe, persistent, or pervasive to limit
> a student's ability to participate in or benefit from
> an education program or activity, or to create a
> hostile or abusive educational environment.

<u>Id.</u> at 12,038.

Because the meaning of this language may not be obvious to school officials, the March 13 guidance lists several factors which should be taken into account when a student is sent to the office for sexually harassing another student.  Among other factors and subfactors, the school official should consider the

School boards could reasonably believe that this form of whipsaw liability would arise in a substantial number of cases. According to a 1993 survey of American public school students, 65% of students in grades eight to eleven were victims of

---

"welcomeness" of the conduct, the age of the harasser, the age of the victim, the relationship between the parties, the degree to which the conduct was sexual in nature, the duration of the conduct, the frequency of the conduct involved, the degree to which the conduct affected the victim's education, the pervasiveness of the conduct at the school, the location of the incident, the occurrence of any similar incidents at the school, the occurrence of any incidents of gender-based but non-sexual harassment, the size of the school, and the number of individuals involved in the incident.

The school official should keep in mind that "in some circumstances, nonsexual conduct may take on sexual connotations and may rise to the level of sexual harassment." Id. at 12,039. He should also remember that "a hostile environment may exist even if there is no tangible injury to the student," and even if the complaining student was not the target of the harassment. Id. at 12,041. In addition, the official must recall that a single act of student-student harassment can create a hostile environment. See id. Finally, the school official must keep in mind that, if he does not kick the alleged harasser out of school, and the harasser misbehaves again, the official could be personally liable if a jury concludes, after the fact, that he could have done more to prevent the harasser from harming his classmates.

The foregoing analysis assumes, of course, that the school official actually knew of the complaint against the harasser and summoned him to the front office. According to the OCR, however, the official may be liable even if he did not know about the harassment: the official may cause the school to violate Title IX if he failed to exercise "due care" in discovering the misconduct. See id. at 12,042. The foregoing does not address the lawsuit that the harasser's parents will file when the school official summarily suspends him. According to appellant and the Department of Justice, the Board received clear notice of this form of liability when it accepted federal funding under Title IX. We think not.

student-student sexual harassment.  See **American Ass'n of Univ. Women Educ. Found., Hostile Hallways:  The AAUW Survey on Sexual Harassment in American Schools** 11 (1993) [hereinafter **AAUW Survey**].  Extrapolating from Department of Education statistics, roughly 7,784,000 public school students in grades eight through eleven would consider themselves to be victims of student-student sexual harassment.[24]  Furthermore, 59% of students (including 52% of female students) in grades eight to eleven responded that they had sexually harassed other students.  See **AAUW Survey**, supra, at 11 - 12.  Thus, if this survey is accurate, around 7,177,000 public school students in grades eight to eleven, male and female, would admit to sexually harassing other students.

We do not adopt these statistics as our own definitive guide to the extent of sexual harassment in America's public schools. We draw attention to these figures only to illustrate what school boards would have to consider in deciding whether to accept federal funding under Title IX.  The **AAUW Survey** could suggest to reasonable public school officials that a substantial number of lawsuits will be brought under appellant's theory of Title IX

---

[24]    To calculate the number of purported student victims of harassment in the nation, we multiplied the percentage of victims provided by the **AAUW Survey** by the total number of students enrolled in public schools in grades eight to eleven during the 1992-1993 school year.  We obtained the enrollment statistics from the world-wide-web home page of the Department of Education. See, e.g., U.S. Dep't of Educ., Enrollment in Public Elementary and Secondary Schools, by Grade: Fall 1980 to Fall 1994 (last modified Mar. 1996) <http://nces01.ed.gov/nces/pubs/D96/ D96T042.html> [hereinafter U.S. Education].  We used the same process to calculate the total number of professed student harassers in the nation.

liability.  Therefore, imposition of this form of liability would materially affect their decision whether to accept federal educational funding.[25]

An enactment under the Spending Clause must read like a prospectus.  Just as a prospectus must unambiguously disclose all material facts to a would-be purchaser, an enactment under the Spending Clause must unambiguously disclose to would-be recipients all facts material to their decision to accept Title IX funding.  The threat of whipsaw liability in a substantial number of cases would materially affect a Title IX recipient's decision to accept federal funding, yet Congress did not provide unambiguous notice of this type of liability in the language or history of that statute.  We will not alter retrospectively the

---

[25]    In JUDGE CARNES' separate opinion, he characterizes our use of statistics as an attempt "to establish that student-student sexual harassment is such a widespread and extensive problem that a different holding of this case would impose massive liability upon school officials and boards."  Post, at *8.  As we indicate in the text, this is not our objective at all.  We cite these statistics because school boards may consider them to be a valid indicator of the amount of litigation that they will face.  If a lawyer for the Monroe County School Board were trying to advise the Board about the potential costs and benefits of accepting federal funding, would it not matter to that lawyer whether accepting federal funds would give rise to a few lawsuits or thousands of lawsuits?

JUDGE CARNES suggests that the **AAUW Survey** overstates the actual number of lawsuits that could be brought under appellant's theory of Title IX liability.  We agree that the survey did not use the same definition of student-student sexual harassment as our case law dictates, but statistical purity would arguably require a jury verdict agreeing with the allegations of each student who claimed to have been harassed.  In any event, there are plenty of reasons for public school officials to overlook the statistical flaws in the **AAUW Survey** when it is their own pocketbooks -- not those of federal judges -- that are at stake.

38

terms of the agreement between Congress and recipients of Title

IX funding.[26]

IV.

We condemn the harm that has befallen LaShonda, a harm for

---

[26]     As noted above, the purpose of enactments under the
Spending Clause is "to further [Congress's] broad policy
objectives by conditioning receipt of federal moneys upon
compliance by the recipient with federal statutory and
administrative directives." Fullilove v. Klutznick, 448 U.S.
448, 474, 100 S. Ct. 2758, 2772, 65 L. Ed. 2d 902 (1980) (opinion
of Burger, C.J.).  Congress uses the spending power "to induce
governments and private parties to cooperate voluntarily with
federal policy." Id.  If no one chooses to receive federal funds
under a proposed legislative program, Congress's intent would be
frustrated and its policy objectives would remain unfulfilled.
See Rowinsky, 80 F.3d at 1013.

Prospective recipients will decline federal funding and
current recipients will withdraw from federal programs if the
cost of legislative conditions exceeds the amount of the
disbursement.  Federal funding represents only 7% of all revenues
for public elementary and secondary schools in the United States.
During the 1992-1993 school year, for example, American schools
received $17,261,252,000 from the federal government out of a
total budget of $247,626,168,000.  See U.S. Education, supra, at
<D96T157.html>.

School authorities must weigh the benefit of this relatively
small amount of funding against not only the threat of
substantial institutional and individual liability -- as
suggested by the **AAUW Survey** -- but also the opportunity costs of
devoting to litigation hours that might otherwise be spent
running their schools.  Because harassment of the sort
experienced by LaShonda is rarely observed directly by school
officials, Title IX claims of the sort envisioned by appellant
would require the time-consuming testimony of numerous student
witnesses.  Imposing the liability of the sort envisioned by
appellant could induce school boards to simply reject federal
funding -- in contravention of the will of Congress.  See
Rowinsky, 80 F.3d at 1013.

39

which Georgia tort law may indeed provide redress.  Appellant's present complaint, however, fails to state a claim under Title IX because Congress gave no clear notice to schools and teachers that they, rather than society as a whole, would accept responsibility for remedying student-student sexual harassment when they chose to accept federal financial assistance under Title IX.  Accordingly, the judgment of the district court is AFFIRMED.

Circuit Judges EDMONDSON, COX, BIRCH, DUBINA, BLACK and CARNES concur in the court's opinion with the exception of Parts III.B and III.C.